# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

LISA D. LEWIS,

PLAINTIFF,

V.

MICHAEL J. ASTRUE,

DEFENDANT.

CIVIL NO. 10-2967 (JNE/TNL)

**REPORT & RECOMMENDATIONS
ON CROSS MOTIONS
FOR SUMMARY JUDGMENT**

Neut L. Strandemo, **STRANDEMO SHERIDAN & DUALS, PA**, 1380 Corporate Center Curve, Suite 320, Eagan MN 55121, for Plaintiff Lisa D. Lewis; and

Lonnie F. Bryan, Assistant United States Attorney, 600 United States Courthouse, 300 South Fourth Street, Minneapolis MN 55415, for Defendant Michael J. Astrue.

## I.      INTRODUCTION

Plaintiff Lisa D. Lewis (Lewis) disputes Defendant Commissioner of Social Security Michael J. Astrue's (Commissioner) denial of her protective application for disability insurance benefits (DIB).  The United States District Court for the District of Minnesota has jurisdiction under the Social Security Act. 42 U.S.C. §§ 405(g), 1383(c)(3).  This matter is before this Court, United States Magistrate Judge Tony N. Leung, for a report and recommendation to the United States District Court Judge on the parties' cross motions for summary judgment.  *See* 28 U.S.C. § 636(b)(1); D. Minn. LR 72.1-2.

Based on the reasoning set forth below, **IT IS HEREBY RECOMMENDED** that the Commissioner's Motion for Summary Judgment (Docket No. 13) be **GRANTED** and that Plaintiff's Motion for Summary Judgment (Docket No. 7) be **DENIED.**

## II.    FACTS

### A.  Work History

Plaintiff alleges an onset date of December 19, 2003. (Tr. 128.) Plaintiff was 45-years old at the time of her application for DIB. (Tr. 104.) Plaintiff is married and has four children. (Tr. 53, 346.) One child is an adult and, at the time of her application, the remaining three were teenagers. (Tr. 53, 346.) Plaintiff has two grandchildren. (Tr. 350.) There is some dispute as to whether Plaintiff completed any college.[1]

Plaintiff earned $10,988.21 in 2001; $3,798.64 in 2002; $10,796.86 in 2003; $328.00 in 2005; $1,189.64 in 2006; and $707.26 in 2007.[2] (Tr. 111, 116, 122, 124, 127.) In 2000, 2002, 2003, and 2007, Plaintiff's wages were from Express Services Inc.  (Tr. 122, 124.) Plaintiff's husband testified that Plaintiff worked for "Express Personnel," which is a temp agency. (Tr. 66.) In 2001, Plaintiff's earnings were approximately half from self-employment and half from wages from the United States Postal Service. (Tr. 122.) In 2005, Plaintiff's earnings were from Kelly Services Inc. (Tr. 122-23.) In 2006, Plaintiff's earnings were from Kelly Services Inc. and Express Services Inc. (Tr. 122-23.)

At the hearing, Plaintiff testified as follows:

---

[1] Plaintiff's counsel states in a footnote to the Memorandum in Support of Plaintiff's Motion for Summary Judgment (Docket No. 8) that "[t]he [Administrative Law Judge] kindly attributes two years of college to [Plaintiff's] credentials. In fact, [Plaintiff] has never attended college. . . . Apparently, the ALJ believes there is some osmotic process by which [Plaintiff's husband's] educational credentials can be transferred to his wife.  This is an example of how far this ALJ will go to mischaracterize evidence seeking to deny [Plaintiff's] claim." Pl.'s Mem. at 6, Nov. 10, 2010. This Court's review of the medical record notes multiple entries that listed Plaintiff as having completed "[s]ome college or 2 year degree." (*See., e.g.*, Tr. 135, 240, 256.) Therefore, there is substantial evidence to support the ALJ's conclusion that Plaintiff completed two years of college. Nevertheless, Plaintiff's educational level is not relevant to the issues raised by Plaintiff.

[2] All of this information is cited because there is a dispute as to whether or not the ALJ erred in making a determination about Plaintiff's employment history.

ADMINISTRATIVE LAW JUDGE (ALJ): . . . [B]ack in '03, where did you work?

PLAINTIFF: '03.

ALJ: You earned $10,000 that year.

PLAINTIFF:   Childcare. I did childcare.

ALJ: . . . Mr. Maulucci . . . [has] got jobs that you've' had if we go back . . . just about 17 years from now, and he has, post office clerk. Did you do –

PLAINTIFF: Yeah

ALJ: – that job full-time?

PLAINTIFF: Yeah.

ALJ: Okay, but you also did childcare.  It looks like you did that full-time.

PLAINTIFF: Yeah, I did that like after I got off work.  I could – I did that.

ALJ: Okay, all right. And when you say you got off work, that's from where?

PLAINTIFF: From the post office –

        . . . .

ALJ: When did that job end?

PLAINTIFF: That didn't – it, it was a short time. It was a short time. I can't even remember. It's been –

ALJ: But within the – but, but by – it was after '91?

PLAINTIFF: Yeah, '91.

        . . . .

ALJ: When you say you worked there a short time, how, how long?

PLAINTIFF: About a year or two years.

ALJ: Oh, oh, okay. Full-time for that year?

PLAINTIFF: Yeah.

ALJ:    Okay. And then, you did some day care full-time after that?

PLAINTIFF:   Yeah.

(Tr. 54-55.) Following this colloquy and in response to a question about her ability to work, Plaintiff testified: "I, I can barely remember, because half of the jobs I do – that I did, I can't remember." (Tr. 55.)

In relation to the vocational expert's testimony, Plaintiff responded to questions about working in childcare. (Tr. 71.)

ALJ: The – and as childcare, you lifted up to 50 pounds, I suppose in that job?

PLAINTIFF: No.

ALJ: Up to how much?

PLAINTIFF: I didn't lift anything. In childcare?

ALJ: Yeah, when you were working in childcare.

PLAINTIFF: No these were –

ALJ: Back –

PLAINTIFF: – big kids.

(Tr. 71-72.)

As part of the application process, Plaintiff reported that she worked as a post office clerk from 1985 through 2003 on an "on and off basis." (Tr. 132.) When Plaintiff worked as a clerk, she worked eight hours per day, five days per week. (Tr. 132.) In this position, Plaintiff walked, stood, sat, climbed, and handled big objects—including boxes that were 20 pounds—for four

hours per day. (Tr. 133.) She knelt, crouched, and crawled one hour per day. (Tr. 133.) She wrote and handled small objects—that were less than ten pounds—two hours per day. (Tr. 133.) In November 2006, Plaintiff reported that she obtained a "very part time job" as a crossing guard starting in September. (Tr. 310.)

### B. Relevant Medical Evidence

#### 1. Plaintiff's Treatment Records

On November 5, 2003, Plaintiff was diagnosed with an epidermoid cyst on her neck, which possibly put pressure on her local nerves and caused tingling and pain in her right arm. (Tr. 230.) Plaintiff elected to not have the cyst removed. (Tr. 230.)

On November 5, 2003, Plaintiff was seen by Dr. Raquel M. Schears in the emergency department. (Tr. 235.) Plaintiff reported that she had mood swings and a neck cyst that was causing her pain. (Tr. 235.) Dr. Schears diagnosed Plaintiff with a dermal cyst and emotional lability that was possibly secondary to estrogen deficiency. (Tr. 236.)

On November 7, 2003, Plaintiff was seen by Dr. Frederick North for evaluation of her depression and menopause. (Tr. 265.) Plaintiff reported that she had changes in her mood in June and July of 2003. (Tr. 265.) Plaintiff reported difficulty sleeping and that she became upset easily. (Tr. 265.) "This [was] causing some marital stress." (Tr. 265.) It was noted that Plaintiff was diagnosed with agitated major depressive disorder in 1998. (Tr. 265.) Dr. North observed that Plaintiff was fidgeting slightly, but her thought process was linear and there was no evidence of delusions or hallucinations. (Tr. 265.) Dr. North reported that Plaintiff's PHQ-9 score[3] was

---

[3] "The Patient Health Questionnaire (PHQ) is a self-administered version of the PRIME-MD diagnostic instrument for common mental disorders . . . [and t]he PHQ-9 is the depression module."  Kurt Kroenke, MD; Robert L. Spitzer, MD; and Janet B.W. Williams, DSW, *The PHQ-9: Validity of a Brief Depression Severity Measure*, 16(9) J. Gen. Intern. Med. 606 (September 2001), *available at* National Center for Biotechnology Information and U.S.

18/27, and "nearly every day [had] anhedonia, sleeping difficulty, decreased energy, appetite disturbances, on more than half the days she fe[lt] depressed, ha[d] difficulty concentrating, and psychomotor changes." (Tr. 265.) Dr. North diagnosed Plaintiff with depression. (Tr. 266.) In connection with this examination, Plaintiff underwent some tests, and, on November 11, 2003, Plaintiff was diagnosed with diabetes based upon her test results. (Tr. 267.)

On December 18, 2003, Plaintiff saw Dr. Matthew D. Sztajnkrycer in the emergency department. (Tr. 233.) Plaintiff reported that she had shortness of breath and chest pain. (Tr. 233.) It was noted that Plaintiff had "significant" childhood asthma, but had been asthma-free for an extended period of time. (Tr. 233.) Her only current medication was Paxil.[4] (Tr. 233.) Dr. Sztajnkrcer concluded that Plaintiff was "apparent[ly] diabetic" and had atypical chest pain with nonspecific changes. (Tr. 234.) Plaintiff was admitted to the hospital for observation. (Tr. 234.)

Once Plaintiff was admitted, Donna M. Kanis-Lachance, R.N., C.N.P. took Plaintiff's medical history. (Tr. 284.) It was noted that Plaintiff had childhood asthma, obesity, dermal cyst, and depression. (Tr. 285.) In relation to her depression, Plaintiff reported that she had "multiple psychosocial stressors in the past and at [the current] point." (Tr. 285.) Finally, it was confirmed that Plaintiff was diabetic. (Tr. 285.)

---

National Library of Medicine, *The PHQ-9*, http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1495268/.

[4] Paxil is the brand name for paroxetine, which is "used to treat depression, panic disorder (sudden, unexpected attacks of extreme fear and worry about these attacks), and social anxiety disorder (extreme fear of interacting with others or performing in front of others that interferes with normal life)." U.S. National Library of Medicine and National Institutes of Health, *Paroxetine: MedlinePlus Drug Information* (April 15, 2011), http://www.nlm.nih.gov/medlineplus /druginfo/ meds/a698032.html.

On December 19, 2003, Plaintiff underwent a coronary angiography, which revealed that Plaintiff had severe coronary artery atherosclerosis.[5] (Tr. 209.) Obstructions of between 50 percent and 80 percent were observed. (Tr. 209.)   Plaintiff underwent a transthoracic echocardiogram that reveal normal functioning, except for mild pulmonary valve regurgitation, trivial tricuspid valve regurgitation, and an atrial septal aneurysm. (Tr. 205, 213.) Plaintiff also underwent an exercise test, in which Plaintiff was able to exercise for 3.3 minutes on a treadmill until she was limited by dyspnea (or difficulty breathing). (Tr. 264.) Plaintiff's functional aerobic capacity was assessed to be 36 percent. (Tr. 264.)

On December 19, 2003, Plaintiff met with Dr. Kyle W. Klarch, who diagnosed Plaintiff with diabetes and anxiety. (Tr. 283.)  On December 19, 2003, Plaintiff also met with Dr. Rick A. Nishimura. (Tr. 282.) Dr. Nishimura suspected Plaintiff had significant unstable angina and "her 'asthma' was pulmonary congestion." (Tr. 282.) Based upon Dr. Nishimura's treatment recommendation, Plaintiff agreed to proceed with coronary artery bypass surgery because her mother was receiving cancer treatment in the area and Plaintiff wanted to care for her mother. (Tr. 282.)

On December 22, 2003, Plaintiff was diagnosed with coronary artery disease, unstable angina, and patent foramen ovale with aneurysmal septum. (Tr. 215.) Plaintiff underwent a coronary artery bypass grafting and suture closure of the atrial septal defect. (Tr. 212, 215, 280.) Plaintiff also underwent pre-bypass and post-bypass transthoracic echocardiograms. (Tr. 212.) The pre-bypass test revealed normal functioning, except for mild mitral regurgitation, atrial

---

[5] "Atherosclerosis is a condition in which fatty material collects along the walls of arteries. This fatty material thickens, hardens (forms calcium deposits), and may eventually block the arteries." National Center for Biotechnology Information and U.S. National Library of Medicine, *Atherosclerosis – PubMed Health* (May 26, 2010), http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001224/.

septial aneurysm with a central fenestration, and patent foramen ovale with right-to-left shunt. (Tr. 212.) The post-bypass test revealed normal functioning and no residual shunt across atrial septum. (Tr. 212.)

Between December 22 and December 26, 2003, Plaintiff underwent multiple sternotomy examinations, which revealed mild cardiac enlargement, pulmonary vascular congestion, interstitial edema, bilateral pleural effusions, infiltration in both lungs, and bibasilar atelectasis. (Tr. 206.)

On December 26, 2003, Plaintiff saw Dr. Kenton J. Zehr. (Tr. 271.) During her examination, Dr. Zehr noted that Plaintiff conversed appropriately and there was "no evidence of gross memory deficits." (Tr. 273.) Plaintiff was diagnosed with obesity, bronchitis, asthmatic exacerbation secondary to the bronchitis, significant coronary artery disease, and glucose intolerance with diabetes mellitus. (Tr. 271.) Plaintiff was instructed that she could not return to work sooner than six weeks. (Tr. 274.) Plaintiff was instructed on how to treat her diabetes and check her blood sugars. (Tr. 263.) She was instructed to check her blood sugars four times per day. (Tr. 263, 275.)

On January 9, 2004, Plaintiff was seen by Dr. North. (Tr. 261.) Plaintiff reported that she can get her blood sugars "down to 90." (Tr. 262.) Normal human concentration of blood sugar (or glucose) is 70 to 110 mg per 100 mL. STEDMAN'S MEDICAL DICTIONARY 817 (28th ed., Lippincott Williams & Wilkins, 2006). Plaintiff was taking Zocor,[6] Lopressor,[7] Amaryl,[8] insulin,

---

[6] Zocor is the brand name for "Simvastatin[, which] is used together with lifestyle changes (diet, weight-loss, exercise) to reduce the amount of fatty substances such as low-density lipoprotein (LDL) cholesterol ('bad cholesterol') and triglycerides in the blood and to increase the amount of high-density lipoprotein (HDL) cholesterol (good cholesterol) in the blood." National Center for Biotechnology Information and U.S. National Library of Medicine, *Simvastatin – PubMed Health* (June 15, 2011), http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000911/.

and aspirin.  (Tr. 261.)  Dr. North diagnosed Plaintiff with coronary artery disease, diabetes, and hypercholesterolemia.  (Tr. 262.)

On February 11, 2004, Plaintiff saw Dr. David W. Claypool and reported that she was experiencing chest pain. (Tr. 231.) Dr. Claypool noted that Plaintiff had diagnoses of diabetes, asthma, obesity, and anxiety. (Tr. 231.) After the examination, Plaintiff was admitted to the hospital for management of her ischemia and diabetes. (Tr. 232.)

While Plaintiff was admitted to the hospital, on February 12, 2004, Plaintiff underwent a coronary angiography, internal mammary graft angiography, percutaneous transluminal coronary angioplasty, and coronary artery stent placement. (Tr. 207, 215.) These procedures revealed that Plaintiff had obstructions ranging from 20 percent to 90 percent in the sections of her coronary artery. (Tr. 208-09.) Following the procedures, Plaintiff's first obtuse marginal branch distal site, which had 90 percent pre-procedure obstruction, was bypassed, and the left ostium, which had predilation stenosis of 90 percent, had postdilation of 30 percent. (Tr. 209.) There were no arteries with more than 40 percent obstruction following these procedures. (Tr. 208-09.) Plaintiff was diagnosed with coronary artery disease. (Tr. 215.)

While Plaintiff was admitted to the hospital, on February 13, 2004, Plaintiff underwent a sternotomy, which revealed cardiac enlargement with pulmonary venous congestion, "infiltrate and/or atelectasis both mid and lower lungs," and "[p]robable small bilateral pleural effusions."

---

[7] Lopressor is the brand name for "Metoprolol[, which] is used alone or in combination with other medications to treat high blood pressure." National Center for Biotechnology Information and U.S. National Library of Medicine, *Metoprolol – PubMed Health* (July 1, 2010), http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000795/.

[8] Amaryl is the brand name for "Glimepiride[, which] is used along with diet and exercise, and sometimes with other medications, to treat type 2 diabetes (condition in which the body does not use insulin normally and, therefore, cannot control the amount of sugar in the blood)." National Center for Biotechnology Information and U.S. National Library of Medicine, *Glimepiride – PubMed Health* (July 15, 2011), http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000981/.

(Tr. 206.) Plaintiff also underwent an transthoracic echocardiogram with tissue doppler interrogation, which revealed that Plaintiff had mild left ventricular enlargement, moderate decrease in left ventricular systolic function, regional wall motion abnormalities, left ventricular diastolic dysfunction, mild left atrial enlargement, moderate mitral valve regurgitation, and moderately increased right ventricular systolic pressure. (Tr. 210.)

On February 14, 2004, Plaintiff saw Dr. Amir Lerman. (Tr. 268.) Plaintiff complained of chest pain and shortness of breath. (Tr. 268.) She reported that for the past week she had asthma attacks. (Tr. 268.) Plaintiff's husband reported that Plaintiff had recently increased her activity and her anxiety level had increased. (Tr. 268.) It was concluded that Plaintiff had no emergency condition and was discharged. (Tr. 269.)

On February 24, 2004, Plaintiff again saw Dr. Lerman. (Tr. 277.) Plaintiff reported that she was not able to sleep at home or engage in rehabilitation. (Tr. 277.) Plaintiff also reported that she had progressive dyspnea the last several weeks with associated chest pain. (Tr. 277.) Plaintiff underwent a sternotomy examination, which revealed that Plaintiff's condition had improved from her visit on February 13, 2004. (Tr. 204, 206.)

On February 26, 2004, Plaintiff was seen by Dr. North. (Tr.259.) Plaintiff reported that she had chest pain over the last three days. (Tr. 259.) Dr. Frederick noted that she had evidence of costochondritis and Dressler's syndrome. (Tr. 260.)

On January 17, 2005, Plaintiff was seen by Laura A. Peterson, with Cardiovascular Research. (Tr. 258.) Plaintiff reported that she had dyspnea following exertion and some chest burning. (Tr. 258.) In January 2005, Plaintiff underwent an ECG, which revealed that Plaintiff had normal sinus rhythm and T-wave abnormality. (Tr. 204.)

On March 8, 2005, Plaintiff saw Dr. North. (Tr. 254.) Plaintiff reported as follows: She was self-employed (Tr. 256.) She was not experiencing any chest pains. (Tr. 254.) She checked her blood sugars once daily and they have been in the low hundreds. (Tr. 254.) She was depressed because of her mother's recent death, but her Paxil was helping. (Tr. 254.) Plaintiff was currently taking Lopressor, aspirin, Zocor, insulin, Paxil, Plavix, Lisinopril,[9] and Nitrostat.[10] (Tr. 255.) Dr. North diagnosed Plaintiff with coronary artery disease, diabetes, mood swings, recurrent vaginitis, and goiter. (Tr. 257.) Dr. North noted that Plaintiff "[n]eeds better control of [her blood] sugar if recurrent vaginitis from candida due to glucosuria." (Tr. 257.)

On April 8, 2005, Plaintiff saw Dr. North. (Tr. 251.) It was noted that Plaintiff was not having further chest pains. (Tr. 251.) Plaintiff reported that she checked her blood sugars daily and her blood sugars were in the low hundreds. (Tr. 251.) Plaintiff reported that she was depressed, but her husband reported that "she is easier to live with on the Paxil." (Tr. 251.) Dr. North diagnosed Plaintiff with coronary artery disease, diabetes, mood swings, recurrent vaginitis, and blurred vision. (Tr. 251-52.)

In February and March 2006, Plaintiff was treated for an open wound on her right medial thigh. (Tr. 243, 244, 246.) In connection with these exams it was noted that Plaintiff was not experiencing any chest pain (Tr. 254); Plaintiff's blood sugars were recently in the low hundreds

---

[9] "Lisinopril is used alone or in combination with other medications to treat high blood pressure." U.S. National Library of Medicine and National Institutes of Health, *Lisinopril: MedlinePlus Drug Information* (Feb. 1, 2011), http://www.nlm.nih.gov/medlineplus/druginfo/meds/a692051.html.

[10] Nitrostat is a brand name for nitroglycerin which is "used to treat episodes of angina (chest pain) in people who have coronary artery disease (narrowing of the blood vessels that supply blood to the heart)." National Center for Biotechnology Information and U.S. National Library of Medicine, *Nitroglycerin – PubMed Health* (Aug. 1, 2010), http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000080/.

(Tr. 244, 254); Plaintiff was depressed; and Plaintiff was only checking her blood sugars every other day. (Tr. 244, 254.)

On April 25, 2006, Plaintiff was seen by Dr. North. (Tr. 239.) Dr. North summarized Plaintiff's prior history. (Tr. 239.) Dr. North noted as follows: Her blood sugars were "in the 300 range 4 of the last 3 days"[11] and "[s]he has had some blurry vision for the last month." (Tr. 239.) She was taking Lopressor, aspirin, Zocor, insulin, Paxil, Lisinopril, Nitrostat. (Tr. 239-40.) After his examination, Dr. North concluded that Plaintiff's glucose levels were "under inadequate control," which was contributing to her blurred vision and "will be a continuing problem in terms of her coronary artery disease." (Tr. 242.) Dr. North noted, "[s]he continue[d] to have some mood problems which also [was] hampering her desire and possibility to take care of herself." (Tr. 242.) Dr. North concluded: "I suspect much of her symptoms will improve with better diabetes control." (Tr. 242.)

On May 18, 2006, Plaintiff was seen by Carol J. Herber, R.N. regarding Plaintiff's recent blood tests. (Tr. 237.) The tests revealed her "glucose control is poor." (Tr. 237.) In May 2006, Plaintiff underwent an echocardiogram and Plaintiff had a normal sinus rhythm and T wave abnormality. (Tr. 203.)

On January 7, 2008, Plaintiff went to a Diabetes/Hypertension clinic. (Tr. 370.) Plaintiff stated that her blood sugars were typically in the 300's. (Tr. 370.) Plaintiff was not keeping a blood sugar log book and did not bring her insulin or laboratory tests for the doctors to review. (Tr. 370.)

On February 11, 2008, Plaintiff was seen at the Salvation Army Eye Clinic and reported that she has had "blurred vision x 1 y[ear]" and "flashing lights [and] floaters [in her] left eye." (Tr. 368.) The treating clinician diagnosed Plaintiff with cataracts, but noted that it was not

---

[11] The Court assumes that Dr. North meant "3 of the last 4 days."

visually significant. (Tr. 369.) The clinician also diagnosed Plaintiff with "[d]iabetes without ocular complications." (Tr. 369.) The clinician suspected that Plaintiff may have glaucoma, but needed to obtain additional information. (Tr. 369.)  Plaintiff had no prescription for glasses and was not prescribed any corrective lenses. (Tr. 368-69.)

On February 18, 2008, Plaintiff went to the Diabetes/Hypertension clinic. (Tr. 371.) Plaintiff reported that her morning blood sugars were between 315 and 526. (Tr. 371.) Plaintiff stated that she preferred her current insulin prescription to treat her diabetes. (Tr. 371.) The treating clinician "doubt[ed her current insulin] would suffice." (Tr. 371.) On March 31, 2008, Plaintiff again went to the Diabetes/Hypertension clinic. (Tr. 366.) Plaintiff was instructed to increase her insulin. (Tr. 366.) On August 4, 2008, Plaintiff was seen by a doctor and was again instructed to increase her insulin. (Tr. 367.)

On August 19, 2008, Plaintiff saw Dr. Ramona S. DeJesus. (Tr. 341.) In terms of Plaintiff's diabetes, Plaintiff reported that her average blood sugar readings were in the 300's and she had occasional episodes of hypoglycemia, but she denied vision problems and numbness or tingling in her legs. (Tr. 341.) In terms of Plaintiff's mood disorder, Plaintiff's husband reported that she was very irritable and experienced mood swings. (Tr. 341.) Plaintiff denied any swings from mania to depression. (Tr. 341.) It was reported that Plaintiff's current medications were Lopressor, Lisinopril, Zocor, Plavix, Levemir, Nitrostat, Prosac, Flovent,[12] Albuterol,[13] aspirin,

---

[12] Flovent is the brand name for "[f]luticasone[, which is an] oral inhalation [medication] . . . used to prevent difficulty breathing, chest tightness, wheezing, and coughing caused by asthma." National Center for Biotechnology Information and U.S. National Library of Medicine, *Fluticasone Oral Inhalation – PubMed Health* (May 1, 2010), http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000055/.

[13] "Albuterol is used to prevent and treat wheezing, difficulty breathing and chest tightness caused by lung diseases such as asthma and chronic obstructive pulmonary disease (COPD; a group of diseases that affect the lungs and airways)." National Center for

and insulin. (Tr. 238.) Dr. DeJesus diagnosed Plaintiff with Diabetes Mellitus Type 2, coronary artery disease, recurrent major depression, hyperlipidemia on therapy, sinusitis, bronchospastic cough, and nicotine dependence. (Tr. 344.)

In October 2008, Plaintiff completed a patient questionnaire. (Tr. 315.) Plaintiff stated that nearly every day she felt down, depressed, or hopeless; had trouble falling asleep or staying asleep; felt tired or had little energy; had poor appetite or over ate; felt bad about herself; and had trouble concentrating. (Tr. 315.) Plaintiff reported that more than half of days she felt little interest or pleasure in doing things, and moved or spoke so slowly that other people had noticed. (Tr. 315.) Plaintiff reported that her symptoms made it very difficult for her to work, take care of things at home, and get along with other people. (Tr. 315.)

On October 10, 2008, Plaintiff was seen by Dr. DeJesus. (Tr. 338.) Plaintiff reported that she checked her blood sugars at home and "[r]eadings still average[d] mostly in the 200's with occasional readings above 300." (Tr. 338.) Plaintiff reported frequent thirst and urination. (Tr. 338.) Plaintiff reported that she was under considerable stress and has noticed episodes of chest discomfort. (Tr. 338.) She had lately been taking her nitroglycerine once or twice per week. (Tr. 338.) Plaintiff "[s]tate[d] that she [was] not able to lift anything heavy because of the discomfort and shortness of breath." (Tr. 338.) Dr. DeJesus concluded that Plaintiff's diabetes mellitus type 2 "[wa]s still significantly uncontrolled." (Tr. 340.) Dr. DeJesus instructed Plaintiff to continue to monitor her blood sugars and pay closer attention to her diet. (Tr. 340.) Dr. DeJesus also concluded that Plaintiff "has a lot of anxiety symptoms and underlying anger." (Tr. 340.) Dr. DeJesus also diagnosed Plaintiff with hyperlipidemia and chest pain. (Tr. 340.)

---

Biotechnology Information and U.S. National Library of Medicine, *Albuterol – PubMed Health* (Sept. 1, 2008), http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000355/.

On November 10, 2008, Plaintiff underwent a sternotomy. (Tr. 325; *see also* Tr. 337.) It was reported that since February 2004, "the cardiomegaly and pulmonary venous hypertension ha[d] resolved." (Tr. 325.) On November 11, 2008, Plaintiff underwent coronary angiography, internal mammary graft angiography, and subclavian artery angiography. (Tr. 328.) Plaintiff was diagnosed with moderate coronary artery atherosclerosis. (Tr. 328.)

On November 18, 2008, Plaintiff also underwent percutaneous transluminal coronary angioplasty and coronary artery stent placement. (Tr. 326, 353.) The predilatation stenosis of the left anterior descending artery was 90 percent and the postdilatation stenosis was 40 percent. (Tr. 328.) The predilatation of the proximal circumflex was 70 percent and postdilatation stenosis was zero. (Tr. 328.) The predeployment of the stenosis was 40 percent and postdeployment stenosis was zero percent. (Tr. 328.) Plaintiff's final diagnosis was coronary artery atherosclerosis. (Tr. 328.)  On November 18, 2008, Plaintiff also underwent a care consultation for her diabetes. (Tr. 349.) Plaintiff reported that her average blood sugars were in the 300's and she recently unintentionally lost 30 to 40 pounds. (Tr. 349.) It was reported that Plaintiff wanted to continue her current treatment regimen and did "not want any oral medications or additional insulin injections." (Tr. 351.)

On November 19, 2008, Plaintiff had a follow-up appointment to her angioplasty. (Tr. 335.) The results of the angioplasty were considered "excellent." (Tr. 335.) Plaintiff had no chest pain and "ha[d] done activities that far exceeded what she had done in the past that exacerbated her chest discomfort." (Tr. 345.) Plaintiff was told that she must take her Plavix every day. (Tr. 335.) Plaintiff declined to attend the cardiac rehabilitation program. (Tr. 348.)  Plaintiff was discharged with the following diagnoses: coronary artery disease, dual-antiplatelet therapy, and uncontrolled diabetes mellitus. (Tr. 345.)

On January 21, 2009, Plaintiff was admitted to the hospital for heart rate and rhythm monitoring. (Tr. 382.) Plaintiff had an echocardiogram, which revealed an ejection fraction of 51 percent, normal left valve size, and a thickened aortic valve. (Tr. 382.) Plaintiff also had a dobutamine sestamibi, which "revealed medium partial reversible defect involving the apical, anterior, and anterolateral segments, consistent with infraction with at least partial viability." (Tr. 382.) Plaintiff also had an angiogram, which revealed "critical in-stent restenosis." (Tr. 382.) Plaintiff was diagnosed with hyperlipidemia, hypertension, and diabetes. (Tr. 382-83.)  It was determined that Plaintiff should continue her medication regimen, with the possibility of future invasive procedures. (Tr. 382.) Plaintiff was discharged on January 23, 2009, with the following medications: Albuterol, aspirin, Flovent, Levemir, Lisinopril, Lopressor, Nitrostat, Paxil, Plavix, insulin, Atorvastatin,[14] and Metformin.[15] (Tr. 383.) Plaintiff was instructed to monitor her blood sugars four times per day. (Tr. 386.)

### 2. Plaintiff's Self-Description & Function Report

In support of her application for DIB, Plaintiff completed a disability report on August 31, 2006. (Tr. 131-37.) Plaintiff reported as follows: Her ability to work was limited by her "heart problems" and her bypass surgery. (Tr. 132.) These conditions caused her pain, limited

---

[14] "Atorvastatin is used along with diet, exercise, and weight-loss to reduce the risk of heart attack and stroke and to decrease the chance that heart surgery will be needed in people who have heart disease or who are at risk of developing heart disease." U.S. National Library of Medicine and National Institutes of Health, *Atorvastatin: MedlinePlus Drug Information* (July 1, 2010), http://www.nlm.nih.gov/medlineplus/druginfo/meds/a600045.html.

[15] "Metformin is used alone or with other medications, including insulin, to treat type 2 diabetes (condition in which the body does not use insulin normally and, therefore, cannot control the amount of sugar in the blood)." National Center for Biotechnology Information and U.S. National Library of Medicine, *Metformin – PubMed Health* (April 15, 2011), http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000974/.

her ability to lift, and profoundly impacted her life. (Tr. 132.) Plaintiff worked after her bypass

surgery, but she had "work restrictions," changed job duties, and worked fewer hours. (Tr. 132.)

In November 2006, Plaintiff completed a second disability report.[16] (Tr. 141-46.)

Plaintiff reported as follows: Her illness changed since her last disability report. (Tr. 142.) The

changes began in October 2006. (Tr. 142.) She had chest pains, her diabetes "g[o]t wors[e],"

and she had headaches. (Tr. 142.) Her ability to care for her personal needs was impacted by

deteriorating vision, being out of breath, and being unable to walk long distances. (Tr. 144.)

Plaintiff completed a third disability report. (Tr. 162-67.) Plaintiff reported as follows:

Her illness changed since her last disability report, including "[her] sugar was up and [she had]

cardic (sic) in . . . one of [her] eyes and [she] was stress[ed] out" (TR. 163), and her legs were

"getting weak." (Tr. 165.) These changes began in December 2006. (Tr. 163.)

On February 23, 2007, Plaintiff completed a function report. (Tr. 148.) Plaintiff reported

as follows: She lived with her family in a house. (Tr. 148.) During a typical day, she took her

medications, saw her children off to school,[17] and walked approximately two blocks. (Tr. 148.)

She reported that other people helped her when she took care of her grandchildren. (Tr. 149.)

She prepared meals with help from her family. (Tr. 150.) "Sometimes [she] stay[ed] in bed."

(Tr. 152.) Sometimes she went outside. (Tr. 151.) But, when she went outside, her she was

---

[16] Plaintiff asserts that this second disability report was completed by Plaintiff's sister. Pl.'s Mem. at 7, 11, Nov. 10, 2010 (citing Tr. 141). The document to which Plaintiff cites (Tr. 141) lets a claimant identify a friend or relative who knows about the claimant's conditions. Plaintiff identified her sister, but the remainder of this report is written in the first person from the perspective of the claimant. Therefore, this Court concluded that the report was completed by Plaintiff.

[17] Plaintiff also reported that she does not take care of her children. (Tr. 148-49.)

always accompanied by someone in her family.[18] (Tr. 151.) She can go grocery shopping and can count change. (Tr. 151.)   Her hobby was watching television. (Tr. 152.) She attended church once per week, but otherwise did not spend time with others. (Tr. 152.)

Plaintiff further reported as follows: Due to her conditions, she could no longer work at a good pace (Tr. 149), could not stand for a long time (Tr. 150), and had difficulty breathing (Tr. 150) and sleeping well. (Tr. 149.) Due to her conditions, her family sometimes helped her dress, wash her hair, and take her insulin and medications. (Tr. 149, 150, 153.) She could not perform outside chores because of chest pain and difficulty with her legs. (Tr. 151.) She could not pay bills, handle a savings account, and use a checkbook because she "forget[s] so much." (Tr. 151.) She was outgoing before she had her condition and she "tr[ied] not to let people [know] about [her] illness." (Tr. 153.) She feared doing activities of daily living, such as cooking and cleaning. (Tr. 154.)

Plaintiff further reported as follows: She could not lift, bend, stand, reach, walk, kneel, climb stairs, see, remember things, complete tasks, concentrate, understand, and get along with others. (Tr. 153.) She could walk 50 feet without needing to rest. (Tr. 153.) She could not follow written instructions without help. (Tr. 153.) She sometimes needed to ask to have spoken instructions repeated. (Tr. 153.) She could not handle stress well. (Tr. 154.) She needed someone around "in case something [went] wrong." (Tr. 154.) She had been unable to work since her bypass surgery because her medications made her sleepy. (Tr. 157.) The only position that she had found that she could perform was as a crossing guard, which did for two hours per day. (Tr. 157.)

---

[18] Plaintiff also reported that she did not need anyone to accompany her when she went out. (Tr. 151-52.)

3.   Interview

On August 31, 2006, Plaintiff completed an in-person interview in support of her application. (Tr. 128-30.) The interviewer observed that Plaintiff had no difficulties in any areas. (Tr. 129.) The interviewer also observed that Plaintiff had good grooming and hygiene. (Tr. 130.) The interviewer noted that Plaintiff did not look at the interviewer and "gave short answers and did not go into any detail." (Tr. 130.) The interviewer further noted that Plaintiff was "uncooperative and had a bad attitude, and had a chip on her shoulder." (Tr. 130.) Plaintiff reported that she was starting a job as a crossing guard and she would be working one hour per day, five days per week. (Tr. 130.)

4.   Physical Residual Functional Capacity Assessment

In October 2006, Plaintiff underwent a physical residual functional capacity assessment. (Tr. 290-92.) The consultant was Dr. Mario Zarama. (Tr. 292.) Dr. Zarama found as follows: Plaintiff's impairments were adult-onset diabetes mellitus, obesity, and coronary artery disease. (Tr. 294.) Plaintiff could occasionally lift and carry 20 pounds. (Tr. 284.) Plaintiff could frequently lift 10 pounds. (Tr. 294.) Plaintiff could stand and walk six hours in an eight-hour workday. (Tr. 294.) Plaintiff could sit for six hours in an eight-hour workday. (Tr. 294.) Dr. Zamara found that Plaintiff had no postural, manipulative, visual, communicative, and environmental limitations. (Tr. 294-98.) Dr. Zamara concluded that the severity of Plaintiff's allegations seemed out of proportion with the findings on exams. (Tr. 298.) Dr. Gregory H. Salmi reviewed the evidence in the file and Dr. Zamara's assessment, and affirmed the assessment as written. (Tr. 312-13.)

5. <u>Administrative Hearing</u>

An administrative hearing was held on October 21, 2008. (Tr. 44.) Plaintiff's testimony was consistent with her self-description and function reports. Some statements are particularly noteworthy: Plaintiff testified as follows: Her health was "getting really worse" and "bad." (Tr. 49.) She had heart problems, diabetes, asthma, cataracts, depression, forgetfulness, and stress. (Tr. 50-51.) She could not work because she could not lift or remember. (Tr. 55.) Her heart burned and hurt, and her nitroglycerine did not relieve the pain. (Tr. 57.) She had trouble sleeping and could not walk because of her asthma. (Tr. 58.) She could sit 20 to 30 minutes and then she needed to walk around because her legs and back would hurt. (Tr. 59.) Plaintiff sat or laid all day long. (Tr. 61, 63.) Plaintiff's medications caused her to hallucinate and caused her problems when she slept. (Tr. 62.)

Plaintiff's husband testified. (Tr. 68.) Of particular note, Plaintiff's husband testified that Plaintiff's medications made her drowsy and prevented her from obtaining employment. (Tr. 68.)

The vocational expert in this action was Paul D. Maulucci. (Tr. 102, 183.) The vocational expert and the ALJ examined whether Plaintiff's childcare work should be considered. (Tr. 71-72.) After the ALJ questioned Plaintiff concerning what lifting was required in childcare, Mr. Maulucci concluded that, although the Dictionary of Occupational Titles classified child care as medium and semi-skilled, "the way it was performed [by Plaintiff], it would be light." (Tr. 71-72.)

The ALJ presented Mr. Maulucci with a hypothetical individual with characteristics similar to Plaintiff who could lift 20 pounds occasionally and 10 pounds frequently, who could stand and sit six hours in an eight-hour workday, who had no limit in walking, and who "all the

nonexertional would be occasional only." (Tr. 73.) Mr. Maulucci testified that such an individual would be able to work in childcare and as a postal clerk. (73.)

The ALJ presented Mr. Maulucci with a second hypothetical individual who was like the first hypothetical individual, except she could only lift 10 pounds occasionally and five pounds frequently. (Tr. 73.) Mr. Maulucci testified that such an individual would be able to work in childcare as performed by Plaintiff. (Tr. 73.)

The ALJ presented Mr. Maulucci with a third hypothetical individual who was like the second hypothetical individual, but she was unable to sustain an eight-hour workday. (Tr. 73.) Mr. Maulucci testified that such an individual could not perform Plaintiff's past work or maintain competitive employment. (Tr. 73.)

### 6. Social Security Disability Examination

Following the hearing before the ALJ, on March 13, 2009, Plaintiff underwent an examination by Mary Arneson, M.D. as part of Plaintiff's application for DIB. (Tr. 387-90.) Dr. Arneson noted that Plaintiff objected to participating in the exam and questioned Dr. Arneson's qualifications. (Tr. 387.) Dr. Arneson also noted: "[Plaintiff] answered most of my questions quite reluctantly, accompanied by demands for justification of the question. . . . [T]his resulted in much of [Plaintiff's] history and exam being omitted." (Tr. 387.) Plaintiff refused to engage in cerebellar testing. (Tr. 389.) Plaintiff objected that the dynometer would be too heavy and "then [made] a very minimal effort to squeeze it, resulting in less than 10 pounds registering on the dial." (Tr. 389.) Plaintiff refused to engage in a range of motion exam. (Tr. 389.) Plaintiff's visual acuity in her right eye was 20/20 and in her left eye was 20/40 without glasses. (Tr. 389.) There was no icterus or conjunctival pallor in her eyes. (Tr. 389.)

Plaintiff reported to Dr. Arneson that she did very little at home and that her children helped her. (Tr. 388.) Plaintiff also reported that she did not cook due to her conditions and she could not walk one block. (Tr. 388.) Dr. Arneson observed that Plaintiff's speech was clear, she could rise from a chair without apparent difficult, her "[g]ait in the exam room [was] slow, with tiny steps, accompanied by complaints of inability to move fast," but her "[g]ait in the hall is brisk, with normal motion in both legs." (Tr. 388-90.) Dr. Arneson also observed that Plaintiff appeared out of breathe when tying her shoes, but her "[b]reath sounds [were] of normal intensity and [were] clear." (Tr. 389.) Dr. Arneson concluded that Plaintiff's activity restrictions could not be determined from the examination. (Tr. 390.)

### C. Procedural History and ALJ's Decision

Plaintiff filed her application for DIB on July 18, 2006, with an alleged onset date of December 19, 2003.  (Tr. 11.) The Commissioner denied her application on October 4, 2006, (Tr. 11, 78), and on reconsideration December 8, 2006. (Tr. 11, 36, 85, 86.)  Plaintiff requested a hearing before an ALJ. (Tr. 23, 34, 38, 40, 42, 91.) The hearing was held on October 21, 2008, before Administrative Law Judge George Gaffaney. (Tr. 8, 44.) In December 2008 and March 2009, the ALJ obtained additional medical records, which he entered into the record. (Tr. 184.) The ALJ issued his decision on May 4, 2009. (Tr. 8, 20.)

The ALJ made the following findings of fact and conclusions of law: Plaintiff has not engaged in substantially gainful activity from December 19, 2003 through December 31, 2006. (Tr. 13.) Plaintiff has the following severe impairments: coronary artery disease post bypass in December 2003, obesity, and diabetes mellitus type 2. (Tr. 13.) Plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 15.) Plaintiff has the residual

functional capacity to perform light work as defined by 20 C.F.R. § 404.1567(b) with the following specific limitations: lifting up to ten pounds occasionally, five pounds frequently; sitting or standing up to six hours out of an eight-hour day, with no limitation on walking; limited to only occasionally climbing, balancing, stooping, kneeling, crouching, and crawling. (Tr. 15.) Thus, the ALJ concluded that Plaintiff is not disabled for the purposes of the Social Security Act. (Tr. 19.)

Plaintiff requested a review of the ALJ's decision.[19] (Tr. 2-5.) The appeals council denied Plaintiff's appeal. (Tr. 1.) Plaintiff subsequently brought the complaint in the present case.

## IV.   ANALYSIS

### A.  Standard of Review

Review by this Court is limited to a determination of whether the decision of the ALJ is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); *Murphy v. Sullivan*, 953 F.2d 383, 384 (8th Cir. 1992).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971) (quotation omitted).  "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings."  *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987).  "Substantial evidence on the record as a whole, . . . requires a more scrutinizing analysis."  *Id.* (quotation omitted). But, the Court should not reverse the Commissioner's finding merely because evidence may exist to support the opposite conclusion.  *Mitchell v. Shalala*, 25 F.3d 712, 714 (8th Cir. 1994); *see also Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993) (stating that the ALJ's determination must be affirmed even if substantial evidence would

---

[19] It appears that Plaintiff initially missed her time for filing her appeal. (Tr. 188, 190, 192.)

support the opposite finding).  Instead, the Court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  *Gavin*, 811 F.2d at 1199.

## B. <u>Legal Framework</u>

To be entitled to DIB, a claimant must be disabled. 42 U.S.C. § 423(a)(E).  A "disability" is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *see also* 20 C.F.R. § 404.1505.

The Social Security Administration adopted a five-step procedure for determining whether a claimant is "disabled" within the meaning of the Social Security Act. 20 C.F.R. § 404.1520(a)(4).  The five steps are: (1) whether the claimant is engaged in any substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) whether the claimant can return to his or her past relevant work; and (5) whether the claimant can adjust to other work in the national economy. 20 C.F.R. § 404.1520(a)(5)(i)-(v). The claimant has the burden of proof to show he or she is disabled through step four; at step five, the burden shifts to the Commissioner. *Snead v. Barnhart*, 360 F.3d 834, 836 (8th Cir. 2004); *see also* 20 C.F.R. § 404.1512(a); *Thomas v. Sullivan*, 928 F.2d 255, 260 (8th Cir. 1991). Ordinarily, the Commissioner can rely on the testimony of a vocational expert to satisfy its burden. *Long v. Chater*, 108 F.3d 185, 188 (8th Cir.1997).

**C. Plaintiff's Claims**

This Court has identified the following arguments in Plaintiff's briefs: First, Plaintiff makes numerous objections to the consultative examination. Pl.'s Mem. at 7, Nov. 10, 2010. Second, Plaintiff argues that she "was treated with incivility, approaching bias, by the Social Security examiner, . . . and the ALJ." Pl.'s Reply at 3, Jan. 28, 2011. Third, Plaintiff argues that the ALJ erred in concluding that Plaintiff and her husband were not credible. Pl.'s Mem. at 9-12, Nov. 10, 2010.  Fourth, Plaintiff argues that the ALJ erred in concluding that Plaintiff's asthma and depression were not severe. Pl.'s Mem. at 4-5, Nov. 10, 2010; Pl.'s Reply, at 2, Jan 28, 2011. Fifth, Plaintiff argues that the ALJ erred in concluding that Plaintiff's impairments or combination of impairments do not meet or equal an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1.  Sixth, Plaintiff argues that the ALJ erred in concluding that Plaintiff had the residual functional capacity to perform her past work in childcare. Pl.'s Reply, at 4, Jan. 28, 2011. Finally, the ALJ erred in concluding that Plaintiff's past relevant work included childcare. Pl.'s Mem. at 3, Nov. 10, 2010.

Defendant opposes Plaintiff's motion for summary judgment and also objects to Plaintiff raising new issues within her reply.

### 1. Consultative Examination

Plaintiff argues that the opinion of Dr. Arneson, the consultative examiner, should be granted less weight because she works for a Michigan "corporation which primarily performs adverse medical examination for insurance companies on people who are claiming workers' compensation injuries or short- and long-term disability benefits." Pl.'s Mem. at 7, Nov. 10, 2010; *see also* Pl.'s Reply, at 4, Jan. 28, 2011. Plaintiff also attached exhibits supporting this contention to Plaintiff's Response to Defendant's Surreply. This Court has disregarded this

contention because it is not supported by the administrative record and it is irrelevant to this proceeding because none of these allegations suggest that Dr. Arneson is not a "qualified medical source" within the meaning of 20 C.F.R. § 404.1519g. This Court has disregarded the exhibit because it is not relevant to this proceeding.

Plaintiff argues that the consultative examination was deficient because only one-half hour was scheduled for the examination. Pl.'s Mem. at 7, Nov. 10, 2010. This objection is without merit.   A 30-minute examination is anticipated by 20 C.F.R. § 404.1519n. There is nothing in the record to support that the consultative examination could not have been completed within 30 minutes had Plaintiff been cooperative. The regulations anticipate a situation in which a claimant is uncooperative with the consultative examination and the regulations do not require the Commissioner to attempt a second consultative examination.   *See* 20 C.F.R. § 404.1518 (stating that the Commissioner can find a person to not be disable for failing to participate in the consultative examination).

Plaintiff argues that the ALJ erred in seeking a consultative examination. Pl.'s Mem. at 7, Nov. 10, 2010. First, this argument is simply another way of arguing that substantial evidence exists in the record to support the finding that Plaintiff is disabled.   Therefore, this argument will be considered when this Court considers whether the ALJ's decision is supported by substantial evidence. Second, it appears from the record that the consultative examination was sought after Plaintiff reported a change in her condition (Tr. 391) and a consultative examination "will normally be required" if "[t]here is an indication of a change in [the claimant's] condition." 20 C.F.R. § 404.1519a(b)(5).

Plaintiff argues that she "was treated with incivility, approaching bias, by the . . . hired consultative examiner," Dr. Arneson. Pl.'s Reply, at 3, Jan. 28, 2011. This Court can find no

basis for bias or incivility in the record. There is no evidence in Dr. Arneson's report to support this assertion and, based upon the records, Plaintiff's only complaint about the consultative examination was that it was a "waste of time." (Tr. 393.)

Plaintiff argues that "[t]he ALJ rejected [Plaintiff's] records at the Mayo Clinic and the Salvation Army Clinic about [Plaintiff's] medical condition . . . [and i]nstead the ALJ accepts the medical records of the consultative examination performed in 2009." Pl.'s Mem. at 7, Nov. 10, 2010. First, to the extent that Plaintiff contends that the ALJ adopted Dr. Arneson's opinion over another "qualified medical source," this contention is unsupported by the record. An ALJ must consider every medical opinion received. 20 C.F.R. § 404.1527(d). The ALJ in the present case cited to multiple medical records, including the consultative examination.  But, the ALJ only cited to the consultative record for Dr. Arneson's observations and the ALJ explicitly noted that "Dr. Arneson did not have adequate information from the examination to assign activity restrictions to [Plaintiff]." (Tr. 18.) This Court will consider the weight that the ALJ gave to the medical opinions in the record later in this report and recommendation.

Second, to the extent that Plaintiff is arguing that the Mayo Clinic or the Salvation Army Clinic doctors are more qualified than Dr. Arneson, *see* Pl.'s Mem., at 8, this Court rejects this argument. Nothing in the Code of Federal Regulations directs the ALJ or this Court weigh qualified medical opinions based upon the type of organization for which the qualified medical experts are employed.

2.  Commissioner's bias

Plaintiff argues that the Social Security examiner and the ALJ "treated [Plaintiff] with incivility, approaching bias." Pl.'s Reply 3, Jan. 28, 2011. This allegation is unsupported by the record. "There is a 'presumption of honesty and integrity in those serving as adjudicators.'"

*Partee v. Astrue*, 638 F.3d 860, 865 (8th Cir. 2011) (quoting *Withrow v. Larkin*, 421 U.S. 35, 47, 95 S. Ct. 1456 (1975)). There is nothing in the record to rebut this presumption or cause the Court to be concerned that the decision at issue was motived by racial or gender bias as Plaintiff clearly suggests.

3.   Plaintiff's Credibility

This Court "defer[s] to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005). In assessing a claimant's credibility, the ALJ must consider: (1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints. *Finch v. Astrue,* 547 F.3d 933, 935 (8th Cir. 2008) (citing *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir.1984)). The ALJ need not explicitly discuss each factor. *Goff v. Barnhart,* 421 F.3d 785, 791 (8th Cir. 2005). "It is sufficient if he acknowledges and considers [the] factors before discounting a claimant's subjective complaints." *Id.* (quotation omitted). "The inconsistencies between [a claimant's] allegations and the record evidence provide sufficient support for the ALJ's decision to discredit [a claimant's] complaints of pain." *Guilliams*, 393 F.3d at 803.

Plaintiff argues that the ALJ erred by rejecting Plaintiff's testimony solely because it was not supported by objective medical evidence. Pl.'s Mem. 9-12, Nov. 10, 2010. The ALJ determined that Plaintiff and her husband's statements concerning the intensity, persistence, and limiting effects of her symptoms are not credible. (Tr. 17.) The ALJ based this determination on the facts that (1) Plaintiff and her husband's statements were in some instances inconsistent with

the medical evidence (Tr. 14); (2) Plaintiff's statements were at times inconsistent with other statements in the record and her behavior (Tr. 14, 18); and (3) Plaintiff did not cooperate with the consultative examiner. (Tr. 18.) For the reasons set forth below, this Court concludes that the ALJ's credibility determination is supported by the record as whole.

There is substantial evidence to support the conclusion that Plaintiff and her husband's statements were inconsistent with the medical evidence (Tr. 14). Plaintiff contends that her and her husband's testimony that she is unable to walk or climb stairs is "verif[ied]" by her medical records generally, and is specifically supported by her coronary artery disease and asthma diagnoses, and the exercise test that Plaintiff underwent prior to her first surgery on December 19, 2003. Pl.'s Mem., at 1, 12, Nov. 10, 2010. While the medical records support Plaintiff's diagnoses, as the ALJ noted and the record confirms, no qualified medical source in any of the medical records states that Plaintiff is limited by her diagnoses. Plaintiff was only prescribed brief limitations for defined periods of time immediately following one her medical procedures. In addition to those inconsistencies noted by the ALJ, in November 2008, following Plaintiff's most recent surgery, it was noted that Plaintiff "ha[d] done activities that far exceeded what she had done in the past that exacerbated her chest discomfort." (Tr. 345.) Furthermore, bronchitis was the only thing noted, by medical professions, to exacerbate Plaintiff's asthma symptoms. (Tr. 271.) And Dr. Nishimura suspected Plaintiff's asthma was "pulmonary congestion." (Tr. 282.)

Plaintiff further contends that her testimony about her blurred vision is supported by her diabetes diagnosis. Pl.'s Mem., at 12, Nov. 10, 2010. While the records support that her diabetes is poorly managed, Plaintiff's noted vision problems were entirely based upon her subjective complaints. As recently as August 2008, Plaintiff reported no vision problems to Dr. DeJesus

(Tr. 341) and the eye clinician diagnosed Plaintiff with "[d]iabetes without ocular complications." (Tr. 369.)

There is substantial evidence to support the ALJ's conclusion that Plaintiff's statements were at times inconsistent with other statements in the record and her behavior (Tr. 14, 18). The ALJ noted that Plaintiff indicated that she did not spend time with others, but also indicated that she attended church, lived with her husband and children, and received help from her family. (Tr. 149-51.) The ALJ noted that Plaintiff testified that she could not do any activities of daily living, but her husband testified that sometimes Plaintiff cooks. (Tr. 18.) The ALJ noted that Plaintiff claimed that she could not continue to work, but her work history prior to the alleged onset date was inconsistent, suggesting that Plaintiff had difficulty maintaining employment. (Tr. 18.)

There is substantial evidence to support the ALJ's conclusion that Plaintiff did not cooperate with the consultative examiner. (Tr. 18.) Plaintiff's only response to this conclusion appears to be her general arguments related to the consultative examination and examiner, *see supra* § II.C.1, and Plaintiff's assertion that she has difficulty concentrating and is irritable.  For the reasons stated above, these arguments are unavailing. Furthermore, the ALJ rejected Plaintiff's contention that she has difficulty concentrating in part because she challenged the consultative examination in a manner that would require intense concentration.

Finally, it is evident that the ALJ did not entirely discredit the testimony of Plaintiff and her husband because the ALJ concluded that Plaintiff had some limitations in her residual functional capacity.

4. Plaintiff's asthma and depression

At step two, a claimant must show she has a "severe impairment," which is "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities . . . ." 20 C.F.R. § 404.1520(c). An impairment is not severe if it falls into the definitions in 20 C.F.R. § 404.1521. For the reasons set forth below, this Court concludes that substantial evidence supports that ALJ's decision that Plaintiff's asthma and depression were not severe impairments.

The ALJ noted that there were "some notations of asthma in the record," but the ALJ concluded that there "are no indications that [Plaintiff's] asthma causes her more than minimal limitations in her ability to perform work-related activity" and Plaintiff's asthma appears to be well-controlled on medication. (Tr. 14.) There is substantial evidence to support this conclusion. For the reasons set forth above, the ALJ did not err in find Plaintiff's statements about her asthma to not be credible and the medical records do not support that Plaintiff was limited by her asthma. Furthermore, when Plaintiff complained of asthma symptoms it was concluded that her asthma was actually "pulmonary congestion" (Tr. 282) and Plaintiff did not need treatment for her asthma because it created no emergency condition. (Tr. 269.)

The ALJ concluded that Plaintiff's depression did not cause more than minimal limitations in her ability to perform basic work activities. (Tr. 14.) In addition to the ALJ's credibility determination, in support of this conclusion, the ALJ noted that Plaintiff had only mild problems with activities of daily living, social functioning, and concentration, persistence, and pace. (Tr. 14.) In terms of daily activities, there is substantial evidence to support that Plaintiff makes meals with the help of her children; goes shopping; watches television; attends church; and bathes, shaves, feeds herself, and uses the toilet. (*See, e.g.*, Tr. 149-52.) In terms of

social function, substantial evidence supports that Plaintiff's family helps her cook, run errands, and take her medication. (Tr. 149-51.) In terms of concentration, persistence, and pace, the ALJ noted that Plaintiff could concentrate enough to question the consultative examiner about the course of the examination. Furthermore, as recently as August 2008, Plaintiff denied Plaintiff denied any swings from mania to depression. (Tr. 341.)

Plaintiff notes that on November 7, 2003, Dr. North diagnosed Plaintiff with major depressive disorder, which is causing reported sleep difficulty, marital stress, and fidgeting. (Tr. 265.) Plaintiff cites Dr. North's diagnosis and observation to support the conclusion that Plaintiff's depression was a severe impairment. While an ALJ must consider every medical opinion received, 20 C.F.R. § 404.1527(d), an "ALJ must [also] resolve conflicts among the various opinions. The ALJ may reject these conclusions if they are inconsistent with the record as a whole." *Heino v. Astrue*, 578 F.3d 873, 879 (8th Cir. 2009). In the present case, it is evident that the ALJ considered Dr. North's conclusion and other medical records concerning Plaintiff's depression because the ALJ concluded that Plaintiff had mild limitations based upon her depression. Thus, as stated above, there is substantial evidence to support the ALJ's conclusion that Plaintiff's depression was not a severe impairment.

### 5. List impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1?

A step three in the sequential analysis, the ALJ must consider whether the impairment meets or equals an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. A claimant bears the burden of establishing the impairment is a disabling impairment (i.e., meets or equals listed impairment). *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006). "For a claimant to show that [her] impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify."

*Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S. Ct. 885, 891 (1990). An impairment is medically equivalent to a listed impairment if it is at least equal in severity and duration to the criteria of any listed impairment. 20 C.F.R. § 404.1526(a). A finding that an impairment equals a listing must be based on medical evidence; symptoms alone are insufficient. 20 C.F.R. § 404.1526(b); *Finch v. Astrue*, 547 F.3d 933, 938 (8th Cir.2008); *Johnson v. Barnhart*, 390 F.3d 1067, 1070 (8th Cir. 2004). "An impairment which can be controlled by treatment or medication is not considered disabling." *Estes v. Barnhardt*, 275 F.3d 722, 725 (8th Cir. 2002) (citation omitted); 20 C.F.R. Pt. 404, Subpt. P, App. 1, at 1.00I1.

In the present case, the ALJ considered whether Plaintiff's impairments satisfied the listing impairments at 4.04 (Ischemic Heart Disease) and 9.08 (Diabetes Mellitus). (Tr. 15.)

The ALJ concluded that, although Plaintiff had a diagnosis of coronary artery disease demonstrated by appropriate acceptable imaging, there was no angiographic evidence showing a narrowing of a nonbypassed coronary artery and resulting very serious limitations in the ability to independently initiate, sustain, and complete activities of daily living. (Tr. 15.)   This conclusion is supported by substantial evidence. The only evidence in the record supporting Plaintiff's inability to initiate, sustain, and complete activities of daily living is from Plaintiff's own statements and Plaintiff's testimony was found not to be credible. Furthermore, Plaintiff has not directed this Court to any evidence in the record nor could this Court find any evidence in the record supporting a narrowing of a nonbypassed coronary artery as required by Listing 4.04.C.1.

The ALJ concluded that, although Plaintiff had a diagnosis of diabetes, there was no evidence in the record to support that Plaintiff had neuropathy demonstrated by significant and persistent disorganization of motor function in two extremities, or acidosis, or retinitis. (Tr. 15.) The ALJ's conclusion is supported by substantial evidence.  Plaintiff has not direct this Court to

any evidence in the record nor could this Court find any evidence to support that Plaintiff had neuropathy demonstrated by significant and persistent disorganization of motor function in two extremities, or acidosis, or retinitis.

　　　6.  Residual functional capacity assessment

　　　In steps four and five, the Commissioner assesses an individual's residual functional capacity. 20 C.F.R. § 404.1520(a)(4)(iv). Residual Functional Capacity is defined as the most a claimant can do despite the limitations of the individual's impairments.  20 C.F.R. § 404.1545(a)(1).

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. . . . [A] job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. . . . If someone can do light work, [the Commissioner] determine[s] that he or she can also do sedentary work . . . .

20 C.F.R. § 404.1567(b).

　　　The ALJ concluded that Plaintiff has the residual functional capacity to perform light work as defined by 20 C.F.R. § 404.1567(b) with the following specific limitations: lifting up to ten pounds occasionally, five pounds frequently; sitting or standing up to six hours out of an eight-hour day, with no limitation on walking; limited to only occasionally climbing, balancing, stooping, kneeling, crouching, and crawling. (Tr. 15.) In making this determination, the ALJ concluded that Plaintiff and her husband's statements concerning the intensity, persistence, and limiting effects of her symptoms were not credible. (Tr. 17.) The ALJ relied upon the absence of objective medical evidence of restrictions, the conclusions of Drs. Zarama and Salmi, and Dr. Arneson's observations.

Plaintiff makes a number of arguments concerning the ALJ's determination of Plaintiff's residual functional capacity. First, Plaintiff argues that the ALJ made his determination of Plaintiff's residual functional capacity based largely upon only the state consultants. Pl.'s Mem. at 8, Nov. 10, 2010.  Second, Plaintiff argues that the ALJ determined Plaintiff's residual functional capacity "based solely on 'objective' medical evidence" and failed to consider Plaintiff's subjective symptoms.  Pl.'s Mem. at 9, Nov. 10, 2010.  Third, Plaintiff also argues that the ALJ rejected Plaintiff's subjective symptoms solely because they were inconsistent with the objective medical evidence. Pl.'s Mem. at 11, Nov. 10, 2010. For the reasons set forth below, this Court concludes that substantial evidence supports the ALJ's residual functional capacity determination.

While an ALJ must consider every medical opinion received, 20 C.F.R. § 404.1527(d), an "ALJ must [also] resolve conflicts among the various opinions. The ALJ may reject these conclusions if they are inconsistent with the record as a whole." *Heino*, 578 F.3d at 879. "However, if medical opinions are consistent, the ALJ need not weigh them." *Hepp v. Astrue*, 511 F.3d 798, 806-07 (8th Cir. 2008) (citing 20 C.F.R. § 404.1527(c)(1)).  The ALJ must consider nonexamining sources and consider them to be opinion evidence. 20 C.F.R. § 404.1527(f).  "While the opinion of a treating physician is entitled to substantial weight, it is not conclusive because the record must be evaluated as a whole. Moreover, a treating physician's opinion is afforded less deference when the medical evidence in the record as a whole contradicts the opinion."  *Howe v. Astrue*, 499 F.3d 835, 839 (8th Cir. 2007) (citation and quotation omitted); *see* 20 C.F.R. § 404.1527(d)(6) (stating that the ALJ must "any factors . . . which tend to support or contradict the [treating physician's] opinion."). The ALJ may give little weight to a treating physician's opinion if that opinion rests solely on the claimant's complaints

and is unsupported by objective medical evidence. *Woolf v. Shalala*, 3 F.3d 1210, 1214 (8th Cir. 1993); *see also Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000).

In the present case, the medical records provide support for Plaintiff's diagnoses, but they are largely devoid of medical opinions on the topic of Plaintiff's limitations.[20] Reviewing the ALJ's decision, the ALJ does not explicitly reject a treating physician's opinion. As noted by the ALJ and as supported by the record, besides those limitations mentioned earlier in this analysis and cited by the ALJ (i.e., the exercise test and after-care instructions following subsequent surgeries), all of the limitations in the medical records are based upon Plaintiff's subjective complaints. Therefore, given the ALJ's credibility determination, the ALJ acted appropriately in ascribing less weight to those portions of the medical records that relate to Plaintiff's subjective complaints. *Craig*, 212 F.3d at 436. In addition to the absence of limitations in the medical records, the ALJ's residual functional capacity assessment is consistent with the residual functional capacity assessment of Drs. Salmi and Zamara, and their assessment is consistent with the medical record as a whole. Therefore, this Court concludes that the ALJ's residual functional capacity assessment is based upon substantial evidence on the record as a whole.

Plaintiff cites repeatedly to the exercise test performed in 2003 to support her contention that there was not substantial evidence to support the residual functional capacity as to Plaintiff's ability to walk. In considering the record as a whole, the ALJ did not err in concluding that Plaintiff had the residual functional capacity to stand six hours in an eight hour work day and walk. The ALJ concluded that none of Plaintiff's treatment providers limited her as far as time on her feet or walking. This conclusion is supported by substantial evidence. Furthermore, the

---

[20] The lack of medical source statements from Plaintiff's treating physicians about Plaintiff's limitations does not render the medical reports incomplete. 20 C.F.R. § 404.1513. It is worth noting that the ALJ also sought additional medical records and a consultative examination.

ALJ noted that in 2009, Dr. Arneson observed that Plaintiff could walk briskly and the ALJ discounted Plaintiff's credibility regarding her limitations. For these reasons this Court concludes that the ALJ's conclusion that Plaintiff could walk or stand for six hours in an eight hour day is supported by substantial evidence on the record as whole.[21]

### 7.  Past Relevant Work & Substantial Gainful Activity

"Past relevant work is work that you have done within the past 15 years, that was substantial gainful activity, and that lasted long enough for you to learn to do it." 20 C.F.R. § 404.1560.   (See §404.1565(a).) "Substantial gainful activity means work that—(a) Involves doing significant and productive physical or mental duties; and (b) Is done (or intended) for pay or profit." 20 C.F.R. § 404.1510. For the year 2003, an individual must have earned more than $800.00 per month for the work to be considered substantial gainful activity. *See* 20 C.F.R. §§ 505.1571-75 (discussing how substantial gainful activity is evaluated); *see also* Social Security Online, *Substantial Gainful Activity* (Oct. 29, 2010), *http://www.ssa.gov/oact/cola/sga.html*.

The ALJ concluded that Plaintiff's past relevant work included childcare work in 2003. (Tr. 18-19.) The ALJ concluded that based upon Plaintiff's residual functional capacity assessment that she could perform this past relevant work because Plaintiff has no limitation in her ability to walk and stand, and Plaintiff did not lift anything when she was performing childcare. (Tr. 19.)

---

[21] In addition to the considerations cited by the ALJ, it is also worth noting that, although Plaintiff complained that engaging in activity—presumably such as walking—caused her chest pain from 2004 through 2007, in 2008 it was noted, that following Plaintiff's most recent procedure Plaintiff, had no chest pain and "ha[d] done activities that far exceeded what she had done in the past that exacerbated her chest discomfort." (Tr. 345.) Furthermore, Plaintiff worked as a crossing guard for an hour at time in 2006. Furthermore, the exercise test report also states that Plaintiff's dyspenea began to normalize at approximately four minutes. All of these factors also support the ALJ's decision, but this Court does not rely upon these facts to conclude that the ALJ's decision is supported by substantial evidence.

Plaintiff argues the ALJ erred in concluding that childcare was past relevant work for the Plaintiff and that Plaintiff could perform childcare work. Pl.'s Reply, at 2, Jan. 28, 2011; Pl.'s Response to Surreply, at 4-5, Feb. 22, 2011. For the reasons set forth below, this Court concludes that the ALJ's determination that Plaintiff has the residual functional capacity to perform her past relevant work in childcare is supported by substantial evidence.

The ALJ's determination that Plaintiff's childcare work in 2003 was substantial gainful activity is supported by substantial evidence. First, Plaintiff earned $10,796.86 in 2003, which averages to over the required $800 per month. Second, in 2003 Plaintiff received income only from Express Services Inc. Plaintiff's husband testified Plaintiff worked for "Express Personnel," which is a temp agency. The following colloquoy in relevant:

> ALJ: . . . [B]ack in '03, where did you work?
>
> PLAINTIFF: '03.
>
> ALJ: You earned $10,000 that year.
>
> PLAINTIFF:   Childcare. I did childcare.

(Tr. 54.) Plaintiff later testified that while she was doing childcare she worked contemporaneously for the post office. But, this testimony is contradicted by the fact that Plaintiff's earning records support that she worked for the United States Postal Service in 2001 and not 2003,[22] and it is contradicted by the following colloquy:

> ALJ: When did that job end?
>
> PLAINTIFF: That didn't – it, it was a short time. It was a short time. I can't even remember. It's been –

---

[22] One reading of the record is that Plaintiff confused the year 2003 with 2001. Plaintiff testified that in the same year she worked for the post office and in childcare. This testimony is consistent with her dual incomes in 2001. In which case, in 2001, her income from childcare would not rise to the level of substantial gainful activity.

ALJ: But within the – but, but by – it was after '91?

PLAINTIFF: Yeah, '91.

. . . .

ALJ: When you say you worked there a short time, how, how long?

PLAINTIFF: About a year or two years.

ALJ: Oh, oh, okay. Full-time for that year?

PLAINTIFF: Yeah.

ALJ:   Okay. And then, you did some day care full-time after that?

PLAINTIFF:   Yeah.

(Tr. 55.) Plaintiff further testified that she was confused about her job history.

As stated earlier, the Court should not reverse the Commissioner's finding merely because evidence may exist to support the opposite conclusion. *Mitchell*, 25 F.3d at 714. In light of the ambiguity in the record, the ALJ resolved the ambiguity and concluded that Plaintiff's past relevant work in 2003 was childcare. Based upon the record, the ALJ's determination is supported by substantial evidence notwithstanding the fact there is evidence to support the opposite conclusion.

The ALJ's determination that Plaintiff had the residual functional capacity to perform childcare as she performed it is supported by substantial evidence.  In defining past relevant work, the ALJ is permitted to ask a claimant for information and may use vocational experts. 20 C.F.R. § 404.1560(b)(2).

A vocational expert or specialist may offer relevant evidence within his or her expertise or knowledge concerning the physical and mental demands of a claimant's past relevant work, *either as the claimant actually performed it* or as generally performed in the

> national economy. Such evidence may be helpful in supplementing
> or evaluating the accuracy of the claimant's description of his past
> work.

*Id.* In the present case, the ALJ examined Plaintiff in response to the vocational expert's testimony.  Plaintiff testified that she did no lifting in childcare. Based upon this statement, the vocational expert testified that a hypothetical individual who was similar to Plaintiff and her residual functional capacity would be able to work in childcare as performed by Plaintiff. (Tr. 73.) The hypothetical is consistent with the ALJ's residual functional capacity assessment. Therefore, the ALJ's conclusion that Plaintiff had the residual functional capacity to perform childcare as she performed it is supported by substantial evidence.

### 8. Defendant's Objections

Defendant objects to Plaintiff raising new issues within her Reply Memorandum that were not raised with Plaintiff's Memorandum of Law. This Court agrees that Plaintiff raised new issues within her Reply Memorandum of Law. *See* D. Minn. LR 7.1(b)(3). Nevertheless, Plaintiff's actions did not prejudice Defendant because Defendant was permitted to file a Surreply. Docket No. 21. Therefore, Defendant's objections are overruled. Furthermore, as this noted above, this Court has disregarded certain assertions raised in Plaintiff's briefing and Plaintiff's exhibits attached to Plaintiff's Response to Defendant's Surreply because those assertions are not supported by the record and the exhibits are irrelevant to this action.

[The remainder of this page is intentionally blank.]

## V.   RECOMMENDATION

For the foregoing reasons, **IT IS HEREBY RECOMMENDED** that: the Commissioner's Motion for Summary Judgment (Docket No. 13) be **GRANTED**; and Plaintiff's Motion for Summary Judgment (Docket No. 7) be **DENIED**.

Dated:        August 8, 2011                        *s/ Tony N. Leung*
                                                     Tony N. Leung
                                                     United States Magistrate Judge
                                                     *Lewis v. Astrue*, 10cv2967 JNE/TNL

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court and by serving upon all parties written objections that specifically identify the portions of the Report to which objections are made and the basis of each objection.  This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals. Written objections must be filed with the Court before August 23, 2011.